# The Commonwealth versus Kunzmann.

*Criminal Courts have cognisance only of Crimes committed within the
proper Jurisdiction.—Elections by Volunteers in Service.—Fraudulent
Voting beyond the State limits not within the jurisdiction of our Crim-
inal Courts.*

1. By the common law, crimes and misdemeanors are cognisable and
punishable exclusively within the jurisdiction where they are committed.

2. An unnaturalized foreigner who fraudulently votes at a company elec-
tion held outside of the state of Pennsylvania, by virtue of the Act of July
2d 1839, relating to "elections by the militia or volunteers in actual service,"
cannot be indicted and punished in this state for such offence.   The Courts
of Quarter Sessions have no jurisdiction over such a case.

WRIT of error to the Quarter Sessions of *Philadelphia county*,
upon a judgment for defendant, entered by said court upon a
demurrer to a bill of indictment against said defendant for illegal
voting.

The bill of indictment charged, that according to the 43d
section of an Act of the General Assembly of this Common-
wealth, entitled "An Act relating to the Elections of this Com-
monwealth," passed the 2d of July 1839, an election was held at
Camp Kalorama, in the District of Columbia, on the second
Tuesday of October 1861, for city and county officers for the city
and county of Philadelphia.   That said Joseph Kunzmann voted
for said officers at said election, in Company I, 21st Regi-
ment, Pennsylvania Volunteers; and that said Joseph Kunzmann
was then and there an unnaturalized foreigner, and not being by
law qualified to vote at said election, did fraudulently vote.

To this indictment the defendant demurred, and alleged as
cause of demurrer:—That the said 43d section of the Act of

[Commonwealth *v.* Kunzmann.]

Assembly, passed July 2d 1839, referred to in said indictment, is unconstitutional and void; that said section is in conflict with the first section of the third article of the Constitution of this Commonwealth; that said section does not authorize an election to be held outside of the state of Pennsylvania; that said section has been repealed; that said law is in conflict with the Constitution of the United States.

The district attorney for the Commonwealth joined in demurrer.

The court below, after argument, sustained the demurrer, and ordered judgment to be entered for the defendant for the cause assigned, viz. :—

"That the said section is in conflict with the first section of the third article of the Constitution of this Commonwealth."

The district attorney for the Commonwealth thereupon sued out this writ, and assigned the following errors:—1. The court below erred in entering judgment on the demurrer for the defendant. 2. The court erred in not entering judgment for the Commonwealth.

*William B. Mann,* District Attorney, for plaintiff in error, after quoting the 43d section of the Act of Assembly of July 2d 1839, Purdon 379, alluded to in the indictment and demurrer, and the 46th and 119th sections of the same act, Purdon 379 and 382, and the 1st section of the 3d article of the constitution, argued as follows :—

It is alleged, that the 43d section of the Act of Assembly is contrary to the constitution, because it authorizes an elector to vote otherwise than in the election district where he has resided ten days immediately preceding the election.

The ten days' residence required by the constitution, is not an absolute requirement as to where the elector shall vote. It is only adding another qualification to those that were necessary under the old constitution. Under that instrument, citizens, in order to enjoy the right of an elector, were required to have a residence in the state and to have paid a tax. The new constitution adds to these, a residence in an election district.

The object of this was to require a fixed residence of at least ten days, in order to prevent electors from voluntarily voting wherever they chose, or wherever they happened to be on the day of the election. The ten days' qualification has no more to do with fixing the place where the elector should vote, than the residence in the state for one year has.

A soldier who volunteers under the military laws and is in the field under a requisition of the President of the United States, does not thereby lose his residence. That is still at the home from which he is only temporarily absent. He may possess all the

[Commonwealth v. Kunzmann.]

qualifications of an elector, including ten days' residence in an election district, in Philadelphia county.

If he vote in camp the same as if he were personally present at the election district where he resides, all the requirements of the constitution are substantially complied with.

And if the vote deposited in camp be forwarded to the return judges, and taken into and counted in the general return, there can be no substantial difference whether his vote is so taken and counted through the intervention of the officers of his company, who are authorized by law to send it, or of the election officers of the district where he resides. The result it produces is the same, though it travels through a different channel.

The volunteer therefore, who, in the words of the Act of Assembly, exercises the right of suffrage as fully as if he were present at the usual place of election, to all intents and purposes, actually votes at such place. He is as responsible for the act, as if he were actually present at the poll of the election district where he resides, and voted there.

The view that ten days' residence in an election district, is only an additional qualification necessary to enable the citizen to enjoy the rights of an elector, and not a direction or requirement as to where the elector should exercise the right of suffrage, is sustained by the resolution of the General Assembly of this Commonwealth of April 26th, A. D. 1844: Purdon 376, pl. 48.

Under this act hundreds of persons annually offer to vote, and vote in the election districts where they have not resided ten days immediately preceding the election. The elector who has resided in an election district eight days immediately preceding an election, and who leaves that district and goes to the election district where he has not resided ten days immediately preceding the election, but only the ninth and tenth days immediately preceding said election, votes without objection under existing laws.

The legislative construction on this article of the constitution, as well as the interpretation by the people, seems to be, that the ten days' residence in the election district immediately preceding the election, means simply a residence of ten days in some election district, and not a requirement or direction as to where the elector shall actually vote.

As the constitutional provision does not require an elector actually to vote in the election district where he has resided ten days immediately preceding an election, and as he may in some cases vote in other districts, and as the legislature has provided in the one case an election district where an elector shall vote, who has removed within ten days immediately preceding an election—and such law is admitted to be constitutional—why may not the legislature enact a law to provide an election district

[Commonwealth *v.* Kunzmann.]

to enable a volunteer, who is fully qualified, to exercise the right of suffrage?

An election district is the creature of the statute and not of the constitution, and where the statute creates an election district for the purpose of receiving the votes of electors qualified to vote under the laws and constitution of the Commonwealth, such enactment cannot be said to violate either the spirit or the letter of that instrument.

The law allowing volunteers in actual military service under a requisition from the President of the United States, or by the authority of this Commonwealth, on the day of a general election, to vote at said election at such place as may be appointed by the commanding officer of the troop or company to which they shall respectively belong, was in force at the time of the adoption of the Constitution of 1839. Its existence must have been well known to the framers of that instrument, but they inserted no prohibition to interfere with it, but left the legislature perfectly free to provide the means for securing to the volunteers the exercise of the right of suffrage. There is no reason why the volunteer should lose this right while in the service of the country. The legislature, by enactment of the 43d section, has provided the only means of securing to them the exercise of this right; and before the court annul such a statute, they must be satisfied that it directly contravenes the express language and meaning of the constitution of the state.

*George M. Conarroe* and *F. Carroll Brewster*, for defendant in error, contended:—I. That the 43d section of the Act of Assembly passed July 2d 1839, referred to in the indictment, is unconstitutional and void, and that said section is in conflict with the 1st section of the 3d article of the constitution of this Commonwealth, which provides that "every white freeman of the age of twenty-one years, having resided in this state one year, and in the election district where he offers to vote ten days immediately preceding such election, and within two years paid a state or county tax which shall have been assessed at least ten days before the election, shall enjoy the rights of an elector." The plain, common meaning of this clause is manifest. The voter must offer his vote where he resides. The constitution is expressed in words familiar to the million. Those words must have their plain, obvious, and natural meaning: 6 W. & S. 114. Constitutions require a strict construction. The words of the constitution furnish the only test to determine the validity of a statute: Sharpless *v.* City, 9 Harris 162; Wolcott *v.* Wigton, 7 Ind. 48; 9 Wheat. 188; 3 Seld. 9.

The Act of 2d July 1839, under which the right of voting by the volunteers is claimed, is a transcript of the Act of 29th March

[Commonwealth v. Kunzmann.]

1813, which was constitutional within the state, as the Constitution of 1790 did not require an elector to reside in a particular election district. The transcript of it, passed in 1839, was reported almost *verbatim* in 1834, by the commissioners to revise the civil code of this state, four years before the constitution was amended so as to require the voter to "reside in the election district where he offers to vote." The legislature, we submit, re-enacted the provisions of the Act of 1813 without noticing their repugnancy to the Constitution of 1838.

Four things are required by the present constitution: 1. That the elector be a resident; 2. That he shall have resided in an election district; 3. That his residence shall have been in the election district where he offers to vote; 4. That he shall have resided in such district ten days immediately preceding the election.

The checks and guards provided by the Election Law are nullities outside of the state limits. Opportunities for and incentives to the commission of fraud are enormously increased, and the district restriction in the present constitution was inserted expressly to prevent such frauds: Debates in Pennsylvania Convention, vol. 9, pp. 296–318. The experience of the recent elections in the camps proves the wisdom of the convention. The residence of a voter is his fixed, permanent home, from which he enlisted when he entered into the military service: Story's Confl. of Laws, §§ 50, 51; Warren v. Thomaston, 43 Maine 406; 10 Pick. 77; 1 Binn. 349, note; 1 Bouv. Inst. 99; 11 Mass. 350; Williams v. Whiting, Id. 427; Auld v. Walton, 12 Lon. Ann. 142; 8 B. Monroe 6; Thomas v. Owens, 4 Maryl. 223; McDaniel's Case, 3 Penna. Law J. 310. See also Kneass's Case, 2 Pars. 578, 81; Catlin v. Smith, 2 S. & R. 268.

II. The said 43d section does not authorize an election to be held outside of the state of Pennsylvania. The language which is relied upon as conferring such authority, merely provides that the qualified citizens in actual military service "may exercise the right of suffrage at such place as may be appointed by the commanding officer of the troop or company to which they shall respectively belong." The only proper construction, it is submitted, to be given to this section, is that the right of suffrage may be exercised at such place within the state as may be appointed by the commanding officer. This is so: 1. Because upwards of twenty sections of the Election Law provide penalties for frauds and illegal voting. Heavy fines are imposed, and imprisonment not exceeding three years is prescribed in certain cases. These penalties cannot be enforced for offences committed without the state. An indictment will not lie for an offence not committed within the jurisdiction: 3 Seld. (N. Y.) 295. 2. Because state laws have no binding force beyond the territorial

[Commonwealth *v.* Kunzmann.]

limits of the state. The legislature cannot be reasonably supposed to assert jurisdiction over soil which does not belong to it: Story's Confl. of Laws, §§ 7, 539. The different states of the union are as independent of each other in point of jurisdiction as nations: Simmons *v.* Commonwealth, 5 Binn. 619. The courts of this state have no jurisdiction over offences committed in another state. Powers granted by law to administrators, executors, and guardians, have no force beyond the limits of the sovereignty conferring them: 6 Johns. Chan. 357; Story's Confl. of Laws, § 512. 3. Because the words " at such place as may' be appointed by the commanding officer" are not sufficient to show an intention of the legislature to authorize acts to be done out of its jurisdiction. Legislative bodies do not usually in their acts of legislation use language to limit their operation, but use general language, and the limitation is implied: Miller *v.* Ewer, 27 Maine 517.

III. The 30th section of the Act of 2d February 1854, Purd. 1096, requiring that " the *general*, special, municipal, and all other except military elections, by the qualified voters of the city of Philadelphia, shall be held in the respective election divisions of the wards of said city;" and further providing that " in all general and special elections within the city of Philadelphia, each ward of the said city shall be an election district," operates, it is submitted, as a repeal, *pro tanto*, of the 43d section of the Act of 1839, so far as relates to the city of Philadelphia. The term " election district" having received a judicial construction in McDaniel's Case, 3 Penn. L. J. 310, the same construction must have been subsequently intended by the legislature: 1 Pick. 154.

The legislature have clearly defined the several classes of elections. This was a general election. Prothonotaries, clerks, &c., it is provided, shall be elected at the " general election:" Purd., 1853, 676, 680. The fact that the election was participated in by persons in the military service does not make it a military election. A " military election" is one for brigade and field officers of the militia: Purd., 1853, 587.

IV. The Act of 2d July 1839, in so far as it may be held to authorize elections by volunteers in service to be held outside of this state, is in conflict with the Constitution of the United States.

The law authorizing the holding of " elections by the militia or volunteers in actual service," provides, by § 46, as follows: —" The several officers authorized to conduct such election shall take the like oaths or affirmations, shall have the like powers, and they, as well as other persons who may attend, vote, or offer to vote at such election, shall be subject to the like penalties and restrictions as are declared or provided in this act, in

[Commonwealth *v.* Kunzmann.]

the case of elections by the citizens at their usual places of election."

These penalties are imposed by numerous sections of the Election Law, and are inflicted as punishments for crimes and misdemeanors committed by election officers of, and persons voting at these elections.

The 6th amendment to the Constitution of the United States expressly prohibits the infliction of these penalties, by providing that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed; which district shall have been previously ascertained by law:" Const. U. S., 6th Amend.

The courts of Pennsylvania, therefore, have *no jurisdiction* over crimes committed within the territorial limits of another state. This principle has been directly ruled by high judicial authority. In North Carolina it has been held that the legislature of that state cannot define and punish crimes committed in another state. Crimes and misdemeanors committed within the limits of each of the United States are punishable only by the jurisdiction of that state where they arise : State *v.* Knight, 1 Taylor, N. C. 65. In Massachusetts the same doctrine has been held : Commonwealth *v.* Clary, 8 Mass. 72.

If, therefore, the Act of 2d July 1839, relating to elections by volunteers in actual military service is unconstitutional, or does not authorize an election to be held outside of the state, or is repealed, or if the courts of this state have no jurisdiction of offences committed beyond the limits of the state, by reason of the prohibition of the 6th amendment to the Constitution of the United States, the defendant in error cannot be lawfully indicted for the offence with which he is charged, and the judgment of the court below should be affirmed.

The opinion of the court was delivered, May 22d 1862, by

WOODWARD, J.—The indictment sets forth that a general election was held in Pennsylvania on the second Tuesday of October 1861, under the laws of the Commonwealth, and that in pursuance of the 43d section of the General Election Law of 2d July 1839, an election was held at Camp Kalorama, in the District of Columbia, on that day, by the captain and lieutenant of Company I, of the 21st Regiment of Pennsylvania Volunteers, the said company being then and there a detachment of militia and a corps of volunteers in actual service, under a requisition from the President of the United States, and by the authority of the Commonwealth; and then goes on to charge that the defendant "not being by law qualified to vote at said election,

[Commonwealth *v.* Kunzmann.]

and being then and there an unnaturalized foreigner, did fraudulently vote" at said election at Camp Kalorama.

To this indictment the defendant filed a general demurrer, and assigned as reasons for his demurrer that the 43d section, under which the election at Camp Kalorama was held, was unconstitutional and void. By demurring, he admits that he was an unnaturalized foreigner, that he was not qualified to vote, and that he voted fraudulently—circumstances which would make him indictable under the 119th section of the General Election Law, if his offence had been committed in Pennsylvania. But how can the Quarter Sessions of Philadelphia take jurisdiction of a misdemeanor committed in the District of Columbia?

This question lies at the very threshold of this case, and although defect of jurisdiction is not one of the reasons assigned for demurring, yet the question is raised necessarily by the demurrer, and though not argued by counsel must be noticed by us. We are not to be precipitated into the discussion of a grave constitutional question in a case of doubtful jurisdiction. The first duty, therefore, is to get a clear conception of this point.

The common law considers crimes and misdemeanors as altogether local and cognisable, and punishable exclusively within the jurisdiction where they are committed. "The *lex loci*," sail Lord Brougham, in Warrender *v.* Warrender, 9 Bligh. 119, "must needs govern all criminal jurisdiction, from the nature of the thing and the purpose of the jurisdiction:" Story on Conflict of Laws, § 620, and cases in note. In England, many statutes have been passed to change the general rule of the common law in regard to the venue of indictments, and to make offences committed within one jurisdiction triable in another; but, without a statute, a party who stole goods in one county and carried them into another, was held to be indictable, at common law, in the latter county, upon the principle that the thief's possession of the goods is a fresh larceny in every county into which he carries them. This rule, however, does not prevail as among the states of our Union; for in Simmons *v.* The Commonwealth, 5 Binn. 618, it was held that a thief who stole goods in the state of Delaware, and brought them into Pennsylvania, could not be indicted here. Our Federal Government has provided itself with various statutes for punishing extraterritorial offences when committed by our own citizens, which statutes rest upon the principle of public law that every nation has a right to bind its own citizens and subjects by its own laws in every other place—a principle which Judge Story explains to mean a right to exercise sovereignty over our own citizens, when they return within our territorial jurisdiction; but not a right to compel or require obedience to our laws on the part of other nations within their own territorial sovereignty: Conflict of Laws, § 22.

[Commonwealth v. Kunzmann.]

Nor are we in Pennsylvania entirely destitute of legislation that is intended for extraterritorial application. The fifth article of our constitution confers upon our courts the powers of Courts of Chancery to "obtain evidence from places not within the state," and by Act of Assembly of 14th April 1828, supplementary to our recording acts, the governor is authorized to appoint commissioners to take acknowledgment of deeds, &c., within any state or territory, and the duties of the commissioners are very specifically defined.

Whatever extraterritorial effect such laws may have, is the result not of any original power to extend them abroad, but of that respect which, from motives of public policy, other nations are disposed to yield to them, giving them effect with a wise and liberal regard to common convenience and mutual benefits and necessities. Says Chancellor Kent, 2 Com. 8th ed. p. 579: "There is no doubt of the truth of the general proposition that the laws of a country have no binding force beyond its territorial limits; and their authority is admitted in other states not *ex proprio vigore*, but *ex comitate*; or, in the language of Huberus, *quatenus sine præjudicio indulgentium fieri potest.*" And according to Judge Story, in the silence of any positive rule, affirming, or denying, or restraining the operation of foreign laws, courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interests: Conflict of Laws, § 38, and see Chief Justice Taney's Opinion in Bank of Augusta v. Earl, 13 Peters' Rep. 519. This I understand to be a statement of the rule of judgment in the courts of the country in which the foreign law is executed, and it is to be inferred, as a matter of course, that the same rule would prevail in the courts of the country from which the law proceeded; that is, if the courts where the law is executed imply a tacit adoption of it from absence of objection, the courts of the jurisdiction furnishing the law will, much more, make the same implication. In addition to this, there are certain general rules in respect to the admission of the *lex loci contractus*, which are recognised in the judicial decisions of all countries. It has become a settled doctrine of public law that personal contracts are to have the same validity, interpretation, and obligatory force in every other country which they have in the country where they were made. Matrimonial rights, as between husband and wife, are determined by the law of their domicil, and personal property follows the law of the owner. These rules are generally recognised by the comity of nations: 2 Kent 579, and cases in note.

Gathering up now so many of these principles as are applicable to the question before us, and making an immediate application of them, it may be said, that if the legislature of Pennsylvania provided by law that any of her citizens, qualified electors,

[Commonwealth *v.* Kuuzmann.]

happening to be in the District of Columbia on election day, might hold a valid election there, and an election was held in pursuance of such law, without objection from the local authorities, we are to hold the jurisdiction of our courts to extend to any of our own citizens who should violate any of the provisions of the law. We could not call on the judicial tribunals of the District to punish the infraction. They would not execute our law, and the fraudulent vote of the defendant would be an offence against no law of their own. It would be an offence only against our statute, and must be so laid in the indictment. But the whole statute would be there, the penal sections as well as the enabling clauses, and if, in an attempt to exercise the privileges of the statute, a citizen incurred its penalties, he would be answerable in our criminal courts when he returns into our jurisdiction. As much so as false swearing under a commission issued out of our courts, or a forged acknowledgment of a deed under our Act of 1828, would be indictable and punishable here. His liability to our jurisdiction rests, however, be it observed, on his citizenship in Pennsylvania. It is because the volunteer soldier, in the service of the general government, is a citizen of Pennsylvania, that the General Election Law attends him beyond our territory, and becomes a rule of action for him wherever he is. It is no rule for the citizens of other states, or for unnaturalized foreigners, simply because we have no power to prescribe rules of action for the citizens and subjects of foreign governments.

What, then, is to be done with an unnaturalized foreigner who casts a fraudulent vote under our election law beyond our territorial jurisdiction—a foreigner who is not alleged in the indictment to be a citizen for any purpose in Pennsylvania, nor to have a domicil here, nor even to belong to the militia or volunteers of the state? Have we jurisdiction to punish such a man for a misdemeanor committed beyond our borders? I think not. The officers who received his vote might be punishable. Possibly an indictment might be framed against him which the criminal courts of the District of Columbia would entertain. But how we can treat him as amenable to our jurisdiction on the face of this indictment I do not see. Had it been charged that he belonged to Company I, of the 21st Regiment of Pennsylvania Volunteers, we might perhaps assume his citizenship, but this is not in the indictment. For aught we know, he may never have been in Pennsylvania until the time he was arrrested for the misdemeanor alleged, and never have been a member of any company of Pennsylvania volunteers. For many purposes the states of the Union and the District of Columbia are not foreign countries to us, but so far as concerns the present question it is not necessary to state the distinctions which grow out of our peculiar political system, for we have no more power to legislate over a

[Commonwealth *v.* Kunzmann.]

sister state or the District of Columbia than we would have to legislate for France or England. Then this is the case of a prosecution of an extraterritorial misdemeanor by an offender not alleged to owe any allegiance whatever to Pennsylvania. If we can entertain jurisdiction of such an offence we must assume that there is legislative power to send the ballot-box beyond our state lines, and that the judicial power accompanies it to punish not only our own citizens who violate it, but any intruder upon it from whatever nation of the earth he may come.

If it be said that if the judicial power do not accompany it, there will be no way of protecting the purity of suffrage, then this would be an argument not only against the constitutionality of those sections of the act which authorized it, but against the probability that the legislature ever intended to give those sections any extraterritorial effect.

If, on the other hand, it were conceded that the judicial power of the state were competent to punish any offender against our Election Law at an election outside of our territory, though he be an alien and not a citizen, it might be pertinently asked what criminal court is to administer the punishment. The criminal jurisdiction of the Quarter Sessions of Philadelphia, like that of similar courts in other counties of the state, is limited to offences committed in the proper county. The general rule is that they can take cognisance of no other. If a citizen, subject when at home to the jurisdiction of one of these courts, commits an offence abroad against a statute of ours, and is punished for it by the appropriate court when he comes home, let that stand as an exception to the general rule. But neither the rule nor the exception will give the Quarter Sessions of Philadelphia jurisdiction to punish an offence committed outside of the state by a man who never belonged to the jurisdiction of that court. As well might the Quarter Sessions of Lancaster, Berks, or Greene county take cognisance of it. Is it indeed so, that without an enabling statute, all and singular the Courts of Quarter Sessions of the state may take cognisance of an extraterritorial offence committed by a foreigner? The law would cease to be a system of principles and rules, if such a thing were possible, and would become a mere jumble of incongruous and arbitrary powers.

We are of opinion that the Court of Quarter Sessions of Philadelphia had no jurisdiction of the indictment prosecuted, and, consequently, we have none. We decline, therefore, to enter into a consideration of the constitutional question raised upon the record, but, for the reasons above given, affirm the judgment.

The following concurring opinion was delivered by

READ, J.—The Act of the 2d of July 1839 was a substantial

[Commonwealth *v.* Kunzmann.]

enactment of the bill, entitled "An Act relating to elections," transmitted on the 25th March 1834, by the commissioners appointed to revise the civil code of Pennsylvania, under the resolution 23d March 1830, to Governor Wolf, and sent by him to the legislature five days after its receipt by him. This bill was a consolidation of the existing laws under the Constitution of 1790, and the provisions in case any of the militia or volunteers shall be in actual service at the time of the general election, were taken from the Act of 29th March 1813, with some verbal amendments.

These sections apply in terms only to the general elections held on the second Tuesday of October, and do not include elections by the citizens held on any other day. The presidential election, which is held on the Tuesday next after the first Monday in November, may fall on the second Tuesday of that month, the very day appointed by the legislature for the return judges to meet, and to include in their enumeration the votes of the volunteers and militia men in actual military service transmitted to the prothonotary of the proper county.

It is also to be remarked, that the language of the Election Law may be entirely satisfied by elections by the companies or troops within the limits of the state, where the Commonwealth exercises exclusive jurisdiction. This is strengthened by the fact, that there is no provision in the act extending its operation in any form over any place beyond the state, whether it be a state or territory—the District of Columbia or any foreign country; and this ought certainly to be expected when our courts are asked to punish crimes committed in a foreign jurisdiction.

The crime alleged in the present bill of indictment, was committed in the District of Columbia, and cannot be punished by any court in Pennsylvania; for "crimes," said Lord Chief Justice DeGrey in Rafael *v.* Verest, 2 W. Bl. Rep. 1058, "are in their nature local, and the jurisdiction of crimes is local." The common law considers crimes as cognisable and punishable exclusively in the country where they are committed. Besides, all our criminal courts are localized, and their jurisdiction extends only to the county in which they are sitting, much less can they take cognisance of an offence in a distant state.

There are, therefore, insuperable objections to any criminal courts in this state, taking cognisance of any of the statutory offences created and punished by the Act of 2d July 1839, when committed, as in the present case, beyond our jurisdiction. I am aware, that great and grievous frauds upon the elective franchise have been perpetrated at the last general election, under the cover of alleged elections by the volunteers, but they must go unpunished, because our courts cannot try offences committed out of their jurisdictional limits.

[Commonwealth *v.* Kunzmann.]

The same arguments would apply, if the legislature had given similar privileges under similar penalties to other classes of citizens temporarily residing in other states or countries, for the power of the legislature is just as great in the one case as in the other, and no greater. I am therefore of opinion, that the Court of Quarter Sessions of Philadelphia county had no jurisdiction, and this appearing on the face of the indictment, the judgment must be affirmed in accordance with the result stated by my brother Woodward, in his opinion.